**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**EDWARD CURANOVIC,**

       **Plaintiff,**                          **Case No. 5:18cv88
(Judge Stamp)**

**JESSICA HOUCHIN, RN; MS.
WILSON, PA; LT. DUVALL;
Dr. ANDERSON, MD; M. WEAVER,
Medical Administrator; ANGELA P.
DUNBAR, Regional Director;
JENNIFER SAAD, Warden; and IAN
CONNERS, Adm. National Inmate
Appeals,**

       **Defendants,**

## REPORT AND RECOMMENDATION

### Procedural History

On May 14, 2018, the Plaintiff initiated this action by filing a Civil Rights

Complaint pursuant to 42 U.S.C. § 1983. ECF No. 1. Because the Defendants are

federal  employees, he was sent a Notice of Deficient Pleading which informed him that

he  must refile his complaint of this court's approved Bivens form. ECF No. 4. On May

31, 2018, the Plaintiff filed a Bivens complaint. ECF No. 7. However, it was not

completed as required by this Court's Local Rules of Prisoner Litigation. Accordingly,

the Plaintiff was sent a Notice of Deficient Pleading and Intent to Strike Pleading and

Dismiss Action, which informed him that he must refile a complaint that was properly

completed. ECF No. 10.  On June 20, 2018, the Plaintiff complied. ECF No. 10.[1]

---

[1] This case has a lengthy history with respect to service. See ECF Nos. 57, 72. However, those
issues have been resolved and have no bearing on the disposition of the case.

Currently pending is the Plaintiff's Motion for a Preliminary Injunction[2] [ECF No. 37], the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment [ECF No. 44], the Plaintiff's Cross Motion for Summary Judgment [ECF No. 82], and the Plaintiff's Motion to Intervene [ECF No. 83].[3]

<b><u>Contentions of the Parties</u></b>

## A. <u>Complaint</u>

In his complaint, the Plaintiff alleges that the Defendants have violated his constitutional rights under the Eighth Amendment by showing deliberate indifference to his serious medical needs. The Plaintiff begins by noting that on June 10, 2017, he experienced back spasms in the middle of the night, fell out of his bunk bed and was unable to get up. He alleges that several hour later, Jessica Houchin ("Houchin"), a nurse, arrived and told him not to move because she felt "bone fragments out of place." He further alleges that he was transported to health services on a stretcher where Michael Weaver ("Weaver") instructed Houchin to give him a steroid injection. The Plaintiff contends that the injection did not help and both Houchin and Weaver refused him further medical attention. He alleges that Weaver ordered him to return to his housing unit, but he could not move. The Plaintiff claims that because he did not follow Weaver's orders, Lieutenant Duvall ("Duvall") and three unknown officers took him to the Special Housing Unit ("SHU") and Weaver issued him an incident report which was later expunged. The Plaintiff alleges that for the first three days in the SHU, he was unable to eat, sleep or get up for medications, and he urinated and defecated on

---

[2] In his motion, the Plaintiff is seeking an order directing FCI Gilmer Health Services to consult and perform what he alleges is much needed back surgery to prevent paralysis. ECF No. 37 at 3.

[3] The Plaintiff requests that the Court intervene and take all necessary action to resolve this matter.

himself. The Plaintiff maintains that on the fifth day in the SHU, Dr. Anderson ("Anderson") saw him but refused to take him to the hospital. He alleges that the Defendants have ignored the recommendation by an outside doctor that he undergo lumber fusion surgery. The Plaintiff alleges that these actions have caused him to gain 40 pounds and suffer from nose bleeds, vomiting, hot flashes, dizziness, chest pains, abnormal heartbeat and high blood pressure. For relief, he requests $5.7 million in damages.

### B. **Motion to Dismiss or, in the Alternative, for Summary Judgment**

In their motion to dismiss or, in the alternative for summary judgment, the Defendants maintain that the complaint should be dismissed for the following reasons:

1. The Plaintiff cannot establish deliberate indifference to his medical condition;

2. Neither his placement in the SHU nor the conditions of the SHU violated the Plaintiff's Eight Amendment rights;

3. The Plaintiff's placement in the SHU did not violate the Plaintiff's due process rights;

4. The Plaintiff made no specific allegations against Defendants Dunbar, Saad or Connors; and

5. The Defendants are entitled to qualified immunity.

### C. **The Plaintiff's Cross Motion for Summary Judgment and Opposition to the Defendant's Motion to Dismiss or for Summary Judgment**

In his cross motion and supporting memorandum, the Plaintiff recites the history of his medical care and treatment from June 10, 2017. In addition, he cites actions by Defendants Dunbar, Saad and Connor which he maintains establishes personal

involvement in the violation of his constitutional rights. He has also attached medical records and email correspondence between himself and health services. In addition, he has attached sworn affidavits from two inmates regarding comments made by Houchin during her June 10, 2017 encounter with the Plaintiff in his cell. As well, the Plaintiff has attached his own affidavit again setting forth a chronology of events in support of his allegations against Defendants Dunbar, Saad and Connors.

**Legal Standard**

A. **Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); See Also Martin at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley at 45-46.  In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed

factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly at 554-55. Therefore, for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003).  In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" to meet the plausibility standard and survive dismissal for failure to state a claim.  Id.

The Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520-1 (1972) (per curiam); Erikson v. Pardus, 551 U.S. 89, 94 (2007); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court

"conjure up questions never squarely presented." <u>Beaudett v. City of Hampton</u>, 775

F.2d 1274 (4th Cir. 1985).

 B. <u>**Motion for Summary Judgment**</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary

judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c). In applying the standard for summary judgment,

the Court must review all the evidence "in the light most favorable to the nonmoving

party." <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court must avoid

weighing the evidence or determining the truth and limit its inquiry solely to a

determination of whether genuine issues of triable fact exist. <u>Anderson v. liberty lobby,</u>

<u>Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden

of informing the Court of the basis for the motion and of establishing the nonexistence of

genuine issues of fact. <u>Celotex</u> at 323. Once "the moving party has carried its burden

under Rule 56, the opponent must do more than simply show that there is some

metaphysical doubt as to material facts." <u>Matsushita Electric Industrial Co. V. Zenith</u>

<u>Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party must present specific

facts showing the existence of a genuine issue for trial. <u>Id</u>. This means that the "party

opposing a properly supported motion for summary judgment may not rest upon mere

allegations or denials of [the] pleading, but...must set forth specific facts showing that

there is a genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of

evidence" favoring the nonmoving party will not prevent the entry of summary judgment.

Id. at 248.   To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation.  Anderson at 248.  Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Matsushita at 587.

### Analysis

## A.  Defendants Angela Dunbar, Jennifer Saad and Ian Conners

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir.2001) (internal citation omitted).  Therefore, to establish liability in a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights.  See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3d Cir. 1988).  Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown.  See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986).  *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a Bivens case.  Rizzo v. Good, 423 U.S. 362 (1976).  Because vicarious liability is inapplicable to Bivens and Section 1983 suits, a plaintiff must plead that each government-official, through the official's own individual actions, has violated the Constitution. Ashcraft v. Iqbal, 556 U.S. 662 (2009).

"Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own conduct." Id. at 1948-49.

With respect to Saad (Warden), Dunbar (Regional Director) and Connors (Administrator National Inmate Appeals), the Plaintiff's properly filed complaint [ECF No. 10] makes no specific allegations with respect  to any of these Defendants. Moreover, his original complaint [ECF No.1] also did not make any specific allegations regarding these Defendants.  However, in his second improperly filed complaint [ECF No. 7] he made allegations against each of these Defendants, which are repeated in his memorandum in support of his cross motion for summary judgment and in opposition  to the Defendants' alternative motions. Those allegations all deal with responses to his administrative grievances, and the Plaintiff now alleges that they demonstrate the required personal involvement to satisfy holding them responsible for deliberate indifference to his medical care.

In Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a Bivens action if the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations."  In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury."  Id.  However, the plaintiff cannot establish

supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs.  Id.  Rather, the plaintiff must show that a supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practice.  Id.

In this case, the Plaintiff has not provided any evidence that these Defendants tacitly authorized or were indifferent to an alleged violation of his constitutional rights. Instead, it appears that those defendants simply failed to grant Plaintiff relief during the administrative process.  However, an administrator's participation in the administrative remedy process is not the type of personal involvement required to state a Bivens claim.  See Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003). Moreover, in reviewing claims of medical care, supervisors are entitled to rely on the judgment of the medical staff as to the course of treatment prescribed. Thus, even assuming these supervisory defendants had notice of Plaintiff's administrative grievance regarding his medical needs, it does not rise to the level of personal involvement for liability in this suit.  See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995); Dunn v. Stewart, 2012 WL 6963923, *5 (N.D.W. Va. 2012); Sanders v. O'Brien, 2011 WL 2972089, *10 (N.D.W. Va. 2011);  DeBerry v. Gilmer,  2010 WL 3937956, *6 (N.D.W. Va. 2010). Accordingly, the Plaintiff cannot maintain a Bivens claim against either Saad, Dunbar, or Connors, and the Plaintiff's complaint against these supervisory defendants should be dismissed.

## B.  Deliberate Indifference

The Eighth Amendment protects prisoners from punishments which "'involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime." Rhodes v. Chapman, 452 U.S. 337, 346 (1981). These principles apply to

the conditions of confinement and require that the conditions within a prison comport with "contemporary standard[s] of decency" to provide inmates with "the minimal civilized measure of life's necessities." Id. at 347; See also Farmer v. Brennan, 511 U.S. 825, 832 (1994) (explaining that both the treatment of prisoners and the conditions of their confinement are subject to scrutiny under the Eighth Amendment).

To establish a violation of the Eighth Amendment with respect to medical care, an inmate must prove two elements. See Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). First, the inmate must objectively prove that the deprivation of medical care was "sufficiently serious." Id. Second, the inmate must subjectively prove that prison staff acted with a "sufficiently culpable state of mind." Id.

The objective element is satisfied by proof of the inmate having a serious medical need. Id. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990). A serious medical need can also exist if a delay in treatment would cause a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[4]

---

[4] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). Arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain

The subjective element is satisfied by showing deliberate indifference by prison staff.  Johnson, 145 F.3d at 167.  The Fourth Circuit has summarized what constitutes deliberate indifference:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. Deliberate indifference may be demonstrated by either actual intent or reckless disregard. A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. Nevertheless, mere negligence or malpractice does not violate the eighth amendment.

Miltier v. Beorn, 896 F.2d 848, 851-52 (4th Cir. 1990) (citations omitted). Furthermore, so long as the medical treatment given is adequate, the fact that an inmate would have preferred a different type of care does not constitute deliberate indifference. Chance v. Armstrong, 143 F.3d 698, 703 (2nd Cir. 1998).  Similarly, the fact that other medical professionals would have pursued a different type of treatment does not, by itself, establish deliberate indifference. Hanson v. Smith, 9 F.3d 1557 (10th Cir. 1993). Accordingly, deliberate indifference is "generally not found when some significant level of medical care has been offered to the inmate."  Atwater v. Gabriel, 2012 WL 750754 (M.D.Pa. 2012).

---

and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2nd Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978).

Prior to arriving at FIC Gilmer, the Plaintiff was housed at MCD Brooklyn. Medical records indicate that the Plaintiff was seen by a physician at that facility on August 9, 2016, approximately four days after he arrived, and a medical history was taken. Notes indicate that the Plaintiff had been on medication for hypertension for two to three years. Notes also indicate that the Plaintiff had a ventral hernia, supraumbilical, to the left of a vertical midline scar which was easily reducible. It was also noted that the Plaintiff's main concern was lower back pain which was reportedly constant following a 2008 motorcycle accident, with a flare-up for the previous few months. The pain was reportedly associated with numbness down his lateral thighs and tingling in his feet. The Plaintiff reported that he had declined surgery in 2009 because he was told there was only a 50/50 chance it would be successful. He stated that over the counter medications did not help and requested a bottom bunk. X-rays taken May 31, 2016 showed degenerative disc disease and facet changes at levels L4-L5 and L5-S1. The provisional diagnosis was bilateral lumbar radiculopathy. An MRI was requested to clarify the diagnosis in anticipation of a neurosurgery consult which was requested to determine whether the plaintiff was a candidate for surgical intervention. ECF No. 46-1 at 2-7. An August 12, 2016 administrative note indicated that the MRI and neurosurgical consult was disapproved by the Utilization Review Committee. Instead, the plan was to consult pain management specialists. ECF No. 46-1 at 1.

On February 23, 2017, the Plaintiff was transferred to FCI Gilmer. On March 28, 2017, the Plaintiff complained to P. A. Wilson that his medications for hypertension were not working. ECF No. 46-4 at 34. Therefore, the Plaintiffs Propranolol was discontinued, but he was prescribed duloxetine, hydrochlorothiazide, Lisinopril and aspirin. Id. at 35. A

scheduled inmate move occurred while the Plaintiff was at Health Services, and P. A. Wilson noted that the Plaintiff did not want to stay to discuss his blood pressure and back pain and left at the move. Id.

Two days later, on March 30, 2017, Dr. David Sanjuan, M.D. evaluated the Plaintiff at Health Services. ECF No. 46-4 at 31. The Plaintiff stated that his back pain had gotten progressively worse the last two weeks to the point that he had been unable to get out of bed that morning. He was given injections of Toradol and Solu-Medrol and was prescribed ibuprofen 800 mg twice a day for seven days. Id.

On April 12, 2017, the Plaintiff saw Dr. Sanjuan again, reporting that his pain was worse every day, now continuous, unbearable, 10/10 in intensity and was radiating to his testicles and lower extremities. ECF No. 46-4 at 29. The Plaintiff's blood pressure was elevated despite medication. The Plaintiff advised that the injections had alleviated the pain for a few days, but the pain had worsened. He stated that duloxetine and ibuprofen were not working. Dr. Sanjuan administered another Toradol injection and ordered an MRI. Id.

On April 20, 2017, P. A. Wilson evaluated the Plaintiff, who stated again that his pain had worsened.  ECF No. 46-4 at 26. She ordered an MRI of the lower spine. The Plaintiff reported that nothing really helped, including physical therapy and injections. He again stated that he declined surgery before coming to prison, because doctors told him that there was only a 50-50 chance of it helping. Id.

On May 22, 2017, the MRI was conducted without contrast. ECF No. 46-4 at 120. The reading physician's impression was that of large central and right-sided L 4-5 disc herniation with a large extruded disc fragment compressing the thecal sac with spinal

stenosis and right-sided neural foraminal encroachment, symptomatic with radiculopathy. Id. On May 26, 2017, Dr. Anderson reviewed the MRI results and scheduled a consult with a provider. ECF No. 46-4 at 24.

On June 6, 2017, P. A. Wilson evaluated the Plaintiff. ECF No. 46-4 at 20-22. She reviewed the MRI and the provisional diagnosis. She ordered amitriptyline tablets, a Toradol injection, and a methylprednisolone injection. She also wrote a consult request for a neurosurgery evaluation, noting the results of the MRI. Id. at 22

On June 10, 2017, EMT/Paramedic Jessica Houchin entered a note indicating that she responded to the housing unit to evaluate the Plaintiff, who was complaining of severe back pain since 1:00 AM. ECF No. 46-4 at 16-18. The Plaintiff reported that he had a severe lower back spasm, which caused his back to arch. He claimed to have heard a popping sound and was experiencing shooting pains down the left side of his back and leg since hearing the sound. The Plaintiff stated he was unable to sit, stand or walk. The Plaintiff was transported to Health Services by backboard. He had positive pulse, motor, and sensation in all extremities but reported severe pain with moving his lower legs and hips. Pursuant to Houchin's note, the physician was notified, and orders were given for an injection of 125 mg Solu-Medrol. Id. at 17. The Plaintiff was to return to the unit in a wheelchair and report to sick call on Monday. He was unwilling to sit. Health Services Administrator Weaver contacted the physician, who advised that the Plaintiff was to remain at the institution. Id. The Plaintiff continued to refuse to return to the housing unit, so he was taken to the SHU by wheelchair, which remained with him. Id. at. The Plaintiff was advised to report to sick call that Monday.[5]

---

[5] June 10, 2017 was a Saturday, and therefore, he was ordered to report on the 12th.

On June 12, 2017, Dr. Anderson entered an administrative note indicating that the decision had been made to keep the Plaintiff in the SHU pending his upcoming neurosurgery consult in the community. ECF No. 46-4 at 14. This decision was made because it was believed that the Plaintiff knew about his upcoming Neurosurgery scheduling. Therefore, to prevent the need to reschedule and to offer him convenience of food tray/shower/toilet facility in a single location, a decision was made to recommend administrative detention placement pending the Neurosurgery consult. Dr. Anderson spoke with SHU officers, and the Plaintiff appeared to be up, eating meals some, with no further complaints noted. Id. In addition, Dr. Anderson noted that although general surgery for hernia repair had been approved, the scheduling priority was for neurosurgery. Id. at 15.

On June 15, 2017, Dr. Anderson evaluated the Plaintiff in Health Services Chronic Care Clinic. The Plaintiff indicated that laying on the harder bunk in the SHU and not having to get up and walk around made him feel  a lot better, though he still had pain with movement. He did not, however, report any radiating pain at that time. Dr. Anderson prescribed Sulindac an increase the Propranolol. Finally, Dr. Anderson wrote a consultation request for physical therapy. ECF No. 46-4 at 9-11.

On June 28, 2017, Physician Assistant Abby Hann and neurosurgeon Dr. Robert Marsh evaluated the Plaintiff at the WVU Department of Neurosurgery. ECF No. 46-4 at 92-95, 104-107. The providers reviewed the May 22, 2017 MRI of the Plaintiff's lumbar spine. Dr. Marsh noted that the Plaintiff might be a candidate for lumbar fusion, but Dr. Marsh requested a follow-up in six weeks for surgical discussion. Id. at 413. The Plaintiff returned to FCI Gilmer that same day.

On July 6, 2017, P. A. Wilson responded to an electronic message from the Plaintiff inquiring about the potential surgery, stating he wanted the fusion surgery. ECF No. 46-4 at 100. P. A. Wilson advised the Plaintiff that they had not yet received the report from the neurosurgeon and would follow-up when it was received. Id. On July 13, 2017, P. A. Wilson again responded to an electronic message from the Plaintiff and advised him that the neurosurgeon had not sent the entire report to Health Services and they were trying to get the last page. Id. at 91.

On July 21, 2017, Dr. Anderson reviewed the neurology reported and entered a new consultation request for the six week follow-up neurosurgery appointment with Dr. Marsh at WVU. ECF No. 46-4 at 1.

On August 25, 2017, the Plaintiff underwent surgical abdominal hernia repair at Stonewall Jackson Memorial Hospital. ECF No. 46-3 at 86. He returned to FCI Gilmer that same day. EMT Houchin noted that the wound looked good and that the Plaintiff received an abdominal binder from Health Services for support. Id. at 99.

On September 26, 2017, P. A. Wilson evaluated the Plaintiff in the Chronic Care Clinic. ECF No. 46-4 at 93-96. She noted that he was being followed by an outside neurosurgeon and had a follow-up appointment scheduled soon. The Plaintiff reported his pain was tolerable at that time. He wanted to discontinue taking Tylenol and Sulindac. His abdominal binder was replaced, as he reported it was confiscated during a routine search. Id.

On September 27, 2017, the Plaintiff returned to the WVU Department of neurosurgery and was examined by nurse practitioner Daniel Law, APRN, FNP-BC. ECF No. 46-4 at 70-73. Nurse Practitioner Law reviewed the May 22, 2017 MRI and

recommended lumbar fusion surgery at L4-S1. On that same date, the neurosurgeon, Dr. Robert Marsh also saw and evaluated the plaintiff, and entered a late note. Dr. Marsh's findings were lumbar spondylosis/severe degenerative disc disease/lumbar radiculopathy/lumbar low back pain. Dr. Marsh recommended that the Plaintiff continued medical management including epidural steroid injections, facet rhizotomy and physical therapy. Dr. Marsh stated if the Plaintiff continued to fail these forms of treatment with worsening back pain, then surgical intervention through fusion might be warranted. Dr. Marsh noted he would continue to assess the Plaintiff in the future. Id. at 72.

On November 6, 2017, Dr. Anderson entered a consult request for physical medicine and rehabilitation for the Plaintiff's back and noted that a physical therapy request was pending ECF No. 46-4 at 90. On November 29, 2017, P. A. Wilson increased the Plaintiff's amitriptyline to 100 mg daily on pill line. Id. at 88.

On December 11, 2017, P. A. Wilson evaluated the Plaintiff in the Chronic Care Clinic. ECF No. 46-4 at 83-87. She noted that the Plaintiff had recently seen the neurosurgeon, and that epidurals and physical therapy were recommended as first-line treatment. If no improvement was noted, then surgery would be considered. The Plaintiff noted that he had received epidural injections in the past without relief. P. A. Wilson prescribed a new blood pressure medication, noting that he was already on "a lot of BP meds," and that he had gained 30 pounds since the summer. The consult request for physical therapy and epidurals were still pending. Id.

On January 9, 2018, P. A. Wilson evaluated the Plaintiff for blood pressure check. ECF No. 46-4 at  80-82. She noted that spinal epidurals had been approved and

appointment scheduled. The Plaintiff was advised of the approval, however, not the appointment date, again for security reasons. Id. at 80.

On June 25, 2018, the Plaintiff was evaluated by a physical therapist at FCI Gilmer. ECF No. 46-4 at 77-78. The therapist assessed impaired muscle performance, noting he had symptoms consistent with lumbar disc disease with radiculopathy. She noted he would benefit from lumbar traction and McKenzie protocol to establish more lumbar activity. He was educated on these procedures, given handouts and the plan was to place him on call out for PT. Id. The Plaintiff  had another physical therapy visit on February 1, 2018. Id. at 74-76. He was counseled on continuing the McKenzie protocol, tolerated traction well, and reported that his pain was lessened after completion of treatment. Id.

P. A. Wilson saw the Plaintiff on February 13, 2018 for blood pressure check. ECF No. 46-4 at 72-74. She noted he had a pending neuro-appointment, which had been scheduled. She ordered chest x-rays based on the Plaintiff's report of a painful bump on the left side of his chest. Blood pressure was improving. The x-ray report revealed no evidence of acute cardiopulmonary process. ECF No. 45-5 at 6,  ¶ 40.

On March 1, 2018, P. A. Wilson prescribed Indomethacin, 50 mg three times per day for low back pain. ECF No. 46-2 at 69.

On March 8, 2018, the Plaintiff had another physical therapy appointment. ECF No. 46-2 at 66-67. He reported that the previous exercises were very aggravating to his low back pain. The therapist completed treatment and the Plaintiff reported decreased pain afterward, but he continued to have extreme stiffness and difficulty with movement.

He was encouraged to continue to perform hamstring and piriformis stretches to alleviate tightness. Id.

On March 13, 2018, the Plaintiff was evaluated by Dr. Adnan Alghadban, Neurology and Neurophysiology, at Associated Specialist. ECF No. 46-3 at 43-44. It was noted that he did not respond to epidural steroid. The specialist prescribed Voltaren 75 mg per day and noted that "he would be a candidate for selective nerve root block, rather than epidural steroids." Id. at 44. Dr. Alghadban further noted "I do not think surgery would be indicated at this time, unless he fails more conservative management. Physical therapy and weight-loss also might be beneficial." Id. Dr. Alghadban indicated he would see the Plaintiff for follow-up in three months. Id.

On March 14, 2018, P. A. Wilson ordered the Voltaren as prescribed by Dr. Alghadban. ECF No. 46-2 at 61. She entered an additional note indicating that the Plaintiff had been seen multiple times by multiple disciplines, with multiple medication tried and failed, as well as PT tried and failed. Id. at 60. P. A. Wilson recommended a return appointment to the neurosurgeon for evaluation for surgery and she entered a consult request for the same. Id.

The Plaintiff saw the physical therapist again on March 29, 2018. ECF No. 46-2 at 56. The therapist noted that the Plaintiff was compliant with his home exercise program but would benefit from an additional neurosurgeon consult because of the severe radicular symptoms. Id.

On April 6, 2018, Dr. Anderson entered a new consult request for neurology. ECF No. 46-2 at 46. On April 20, 2018, P. A. Wilson prescribed Toradol injections for pain. Id. at 44. On April 24, 2018, the Plaintiff signed for a Transcutaneous Electrical

Nerve Stimulation ("TENS") unit after requesting one from P. A. Wilson in an electronic message. Id. at  37, 42.

On May 2, 2018, the Plaintiff was evaluated for blood pressure check, and P. A. Wilson noted she would request non-formulary Gabapentin for pain. ECF No. 46-2 at 43. On May 10, 2018, the Plaintiff had another physical therapy visit and reported "pretty severe" pain. Id. at  39. On May 11, 2018, the Plaintiff was evaluated in the chronic Care Clinic by Dr. Plaud. He was prescribed Losartan for hypertension and other medications were renewed. Id. at 33-38. On May 14, 2018, Gabapentin was approved in an administrative note. Id. at 30. On May 15, 2018, Dr. Anderson performed a chart review and noted that the Utilization Review Committee Request for a nerve block and for neurosurgery consult were pending. Id. at 29. On May 24, 2018; June 7, 2018; and June 21, 2018, the Plaintiff had additional physical therapy sessions and he reported receiving some relief from the sessions. Id. at 25-26, 22-23, 19-20.

On July 2, 2018, P. A. Wilson evaluated the Plaintiff and noted he had an appointment set up with the neurosurgeon soon. ECF No. 46-2 at 15. On July 12, 2018, the Plaintiff had a physical therapy session. The therapist noted she would place him on hold after the current session secondary to limited progress. He was to contact her if the pain became unbearable. Id. at 102.

On August 13, 2018, Dr. Plaud evaluated the Plaintiff in the chronic Care Clinic and medications were changed and renewed. Dr. Anderson reviewed the chart, ordered more blood pressure checks and scheduled future chronic care visits. ECF No. 46-2 at 5-9. On August 21, 2018, Dr. Anderson reviewed an abnormal EKG, noted this was a chronic finding, and scheduled follow-up appointments to review blood pressure. Id. at

3. On August 24, 2018, Dr. Anderson saw the Plaintiff for follow-up as to his blood pressure. Dr. Anderson reviewed the Plaintiff's history relative to blood pressure. The Plaintiff's exam, vitals, recent labs, EKG, chest x-ray, and prior lab results were noted, and medications were changed. More extensive investigations were ordered (specialty labs, ultrasound of heart and kidneys, consultation request for cardiology evaluation, added to the list for overnight apnea testing), blood pressure checks requested, and a follow-up appointment for recheck was entered. Id. at 36-40.

On September 7, 2018, Jon Bremer, paramedic, saw the Plaintiff, unscheduled, for complaints of headache and blurry vision. Id. at 28-29. The Plaintiff took his evening medications while at Health Services. Vital signs both prior to scheduled medications and after his scheduled medications were taken and noted. Bremar contacted Dr. Anderson by phone and Dr. Anderson initially directed that the Plaintiff be sent to the emergency room. After taking the medications, however, the Plaintiff's headache and vision improved. Bremar called Dr. Anderson again, who directed him to have the Plaintiff follow-up Monday morning instead of leaving the institution. The Plaintiff agreed to the plan of care. A verbal order for acetaminophen for 30 days for pain was entered. Id. on September 10, 2018, Paramedic Bremar saw the Plaintiff for blood pressure follow-up. The Plaintiff's blood pressure was near normal and a review of his treatment plan was noted. Id. at 25-26. On September 11, 2018, Dr. Anderson conducted a chart review and noted marked improvement in blood pressure since the Plaintiff had been placed on directly observed therapy (medications taken on evening pill line). Id. at 24.

On October 1, 2018, P. A. Wilson entered an administrative note following the Plaintiff's correspondence requesting to stop the pain medication and asking about the

neurosurgery follow-up. P. A. Wilson discontinued the indomethacin and Elavil and noted in her response to him that the neurosurgery appointment was very soon. Id. at 20-21. The following day, Dr. Anderson evaluated the Plaintiff on follow-up. The Plaintiff complained of some swelling in the ankles. The Plaintiff was concerned about sleep apnea, stating he was not very active due to the back pain, and requested a "wrap" (abdominal binder/back brace). The Plaintiff's vitals were near normal. Dr. Anderson noted recent labs, medication changes for both pain/blood pressure/swelling, and new lab orders. A back brace was issued. He further noted the Plaintiff's commissary choices, listed on the medical record, were poor choices for low sodium/weight loss. Pending consultation requests included neurosurgery follow-up, nerve root block, echocardiogram, renal ultrasound, and cardiology. Id. at 16-19. On October 10, 2018, non-formulary pain medication Pregabalin which have been requested and approved on October 2, 2018, was entered. Gabapentin had been discontinued earlier. Id. at 14. On October 23, 2018, Dr. Anderson entered an administrative note after the Plaintiff sent correspondence claiming the new water pill was not helping at all with swelling, requesting to change his twice daily pain medication to the evening line, complaining of trouble sleeping, and stating that the pain medication did nothing for him. Therefore, Dr. Anderson changed the Plaintiff's medications, ordered labs, reviewed the Plaintiff's recent blood pressures, and noted that he intended to get more information about the headaches. Accordingly, P. A. Wilson asked the Plaintiff to provide additional information about his headaches. The Plaintiff replied with more information about the headaches but failed to respond to all the questions. He noted the headaches had been going on for three years and attributed them to "not having the right BP meds."

Response to this correspondence again reiterated the consultations requested, including neurosurgery, nerve root block, echocardiogram renal ultrasound and cardiology evaluation. It was noted that medications were changed again. Id. at 11-13, 81-82. On October 30, 2018, the Plaintiff sent correspondence complaining of dark urine and was instructed to come to sick call in the morning; however, he failed to report. Id. at 80.[6]

In support of his Motion for Summary Judgment and in response to the Defendants' motion, the Plaintiff has supplied medical records, some of which are duplicative of those supplied by the Defendants, but some of which are new.

On December 21, 2018, the Plaintiff was seen in the emergency department[7] with complaints of uncontrolled hypertension which was recorded as 190-111 with episodes of headaches and dizziness that had progressively worsened over the past several weeks. The Plaintiff was admitted to the medical surgical telemetry and his home medications were reviewed and restarted as needed. The Plaintiff was initially placed on hydralazine but showed no improvement. That medication was discontinued as was his propranolol. He was switched to metoprolol and nifedipine and his blood pressure than normalized. The Plaintiff was discharged on December 23, 2018. ECF No. 82-7 at 73.

On December 26, 2018, the Plaintiff was seen at the WVU Department of Neurosurgery on referral by Dr. Anderson. He reported constant, lumbar pain described as throbbing that radiated to his left buttocks. He also reported intermittent numbness

---

[6] The medical records provided by the Defendants in support of their Motion to Dismiss or for Summary Judgment end here.

[7] It is not clear to which hospital he was taken.

and tingling in lateral legs extending to his feet with prolonged sitting and laying. He denied bowel or bladder incontinence or recent falls. The plan indicated was to obtain a new MRI of the lumbar spine without contrast at the prison. The plan was to return to the clinic after imaging to see Dr. Marsh for surgical evaluation. ECF No. 82-7 at 89-90. As of March 19, 2019, the MRI was pending as was the neurosurgical consult. Id. at 17.

The above recited medical records establish that even if the Plaintiff's back condition and high blood pressure constitute serious medical problems, thus satisfying the objective element, they clearly establish that he has received substantial and adequate care. Therefore, the Plaintiff cannot satisfy the subjective component, and he fails to establish an Eighth Amendment violation.

In summary, there is simply no evidence that medical defendants ignored expert opinion and deliberately withheld recommended surgery. In fact, the only recommendation for surgery was expressed by a Nurse Practitioner at WVU on September 27, 2017, after he reviewed the May 22, 2017 MRI. Conversely, Dr. Marsh evaluated the Plaintiff that same date and  recommended that he continue medical management including epidural steroid injection, facet rhizotomy and physical therapy. Significantly, Dr. Marsh noted only that surgical intervention through fusion might be warranted if the Plaintiff failed the other forms of treatment with worsening back pain. Furthermore, Dr. Alghadban, who saw the Plaintiff on March 13, 2018, noted that he did not think that surgery was warranted unless he failed more conservative. management.

The medical records establish that Plaintiff was seen on multiple occasions, was monitored for progress, was prescribed medication to control his pain and was referred for consults as needed. Most cases alleging medical Eighth Amendment violations

concern the denial of medical care to a prisoner rather than the provision of substandard care; i.e., "no care," rather than "bad care." See e.g., Holmes v. Sheahan, 930 F.2d 1196 (7th Cir. 1991), cert. denied, 502 U.S. 960 (1991). Here, even if the undersigned concluded that the Plaintiff received "bad care," which he does not, the Plaintiff did receive care. In short, the medical records fail to establish that Plaintiff's treatment by Medical Services at FCI Gilmore was improper, let alone so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Moreover, ignoring the treatment preferences of an inmate, in this case surgery, does not constitute deliberate indifference, so long as the given treatment is adequate. Accordingly, Plaintiff has failed to prove the subjective element of his Eighth Amendment claim, and his complaint regarding his medical care is without merit.

## C.  Placement in the SHU

As previously noted, the Plaintiff was placed in the SHU on June 10, 2017, after he was issued an incident report for refusing to obey an order from Defendant Wheeler to return to his regular quarters after being seen in Medical Services.  ECF No. 45-3 at 15. However, the Plaintiff's disciplinary record reveals no incident report or disciplinary action stemming from the June 10, 2017 incident. ECF No. 45-2. It is possible that the charges were dismissed by the Unit Disciplinary Committee or the Disciplinary Hearing Officer.

To the extent that the Plaintiff is alleging that his placement in the SHU implicated a Due Process right, the same is without merit. For inmate housing to implicate a Due Process right, it must "impose[ ] atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life," Sandin v. Conner, 515 U.S. 472, 484 (1995), and being housed in segregation, by itself, is not an atypical hardship. See Beveratti v. Smith, 120 F.3d 500, 503 (4th Cir. 1997) (holding that administrative segregation for six months with vermin, human waste, flooded toilet, unbearable heat, cold food, dirty clothing, no outside recreation, and no education did not constitute atypical conditions as to impose a significant hardship). Additionally, any complaint of a change  in security or custody classification cannot establish a constitutional violation because "prison officials can change an inmate's classification for almost any reason or no reason at all." Brown v. Ratledge, 2017 WL 4404248 at *7 (W.D. Va. Sept. 29, 2017) aff'd 709 F. App'x 215 (4th Cir. 2018).

Furthermore, the Plaintiff has not established that his nine days in the SHU, from June 10, 2017, until June 19, 2017, resulted in serious physical or emotional injuries or the grave risk of such harm. In fact, SHU placement benefitted the Plaintiff in that he had toilet and shower facilities in the cell and had his meals brought to him in the cell. Moreover, the Plaintiff, himself, acknowledged on June 15, 2017, that laying on the harder bunk in the SHU and not having to get up and walk around made him feel a lot better, though he still had pain with movement. ECF No.  46-4 at 9. The mere fact that the Plaintiff believes he should have been taken to an outside hospital on June 10, 2017, as opposed to being returned to his regular cell, does not establish an Eighth Amendment violation.[8]

---

[8] As noted in the medical history outlined in this Report and Recommendation, the Plaintiff had an MRI without contrast on May 22, 2017, and Dr. Anderson reviewed the results on May 26, 2019 and scheduled a consult with a provider. That consult took place on  June 28, 2017. Therefore, although he did not personally examine the Plaintiff on June 10, 2017, he was familiar with his history and knew that a consultation was scheduled. Therefore, his professional decision to keep the Plaintiff in the institution is not unreasonable.

## RECOMMENDATION

For the reasons stated above, it is hereby **RECOMMENDED** that Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment [ECF No. 44] be **GRANTED**, the Plaintiff's Cross-Motion for Summary Judgment [ECF No. 82] be **DENIED**, and Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**. It is further **RECOMMENDED** that the Plaintiff's Motion for  Preliminary Injunction [ECF No. 37] and Motion to Intervene [ECF No. 83] be **DENIED AS MOOT**.

The parties shall have fourteen days from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  A copy of such objections should also be submitted to the United States District  Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave  to exceed the page  limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to send a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record by electronic means. In addition, because this Report and Recommendation completes the referral from the District Court, the Clerk is **DIRECTED** to terminate the Magistrate Judge association with this case.

DATED: July 16, 2019

*/s, James P. Mazzone*
JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE